INTERNATIONAL ASSOCIATION OF
HEAT & FROST INSULATORS et
al., Appellant,

v.

Ragan E. GRAHAM, Appellee.

No. 4902.

Court of Civil Appeals of Texas,
Eastland.

Dec. 9, 1976.

Rehearing Denied Jan. 6, 1977.

Marvin B. Peterson, Combs, Archer & Peterson, Houston, for appellants.

John L. Russell, Ragan, Russell & Rorschach, Raybourne Thompson, Jr., Vinson, Elkins, Searls, Connally & Smith, Houston, for appellee.

RALEIGH BROWN, Justice.

Ragan E. Graham sued International Association of Heat & Frost Insulators and Asbestos Workers Local Union # 22, Pacific Mutual Life Insurance Company, The Houston Insulation Contractors Association and its individual members, The Joint Pension Committee and its individual members including Herbert Larberg, Carl J. Shilcutt, A. B. Willis, Jr., Earl B. Herring, Richard J. Lampton and Bill Dailey. Plaintiff alleged he had wrongfully been denied pension plan benefits. Trial before the court resulted in a judgment for Graham in the sum of $11,072.25 for sums due through June, 1975, and decreed monthly benefits from that date for Graham and upon his death for his widow. International Association of Heat & Frost Insulators and Asbestos Workers Local Union # 22 appeals. We affirm.

Appellant presents fourteen no evidence points of error, but states:

"This case involves questions of law that have never been passed on or decided by the Texas Courts. The principle question that must be answered on this appeal is whether the eligibility requirements for past years credited service under the Appellant's pension plan were so arbitrary, capricious and unreasonable as to deprive the Appellee of a property right. The answer to that question will

effectively dispose of all of the issues contained in this appeal."

The pension plan, effective July 1, 1960, provided that employees could claim qualifying credit for work performed for employers with contracts with the union during their lifetime before the plan came into existence. This applied to years worked prior to July 1, 1958. The plan, however, required employees to be working for a contributing employer on January 1, 1960, to receive credit for work performed prior to July 1, 1958. If not so employed, the employee could receive credit only for work performed after July 1, 1958. It is undisputed Graham was not employed by a contributing employer on January 1, 1960.

Graham worked on insulation jobs at various cities. He began working under the union by permit in 1939. That year he applied for membership in Local # 22 and applied for membership in Local # 22 on three or more occasions beginning in 1942. In 1942, at the recommendation of union business agents from Houston and San Antonio, Graham joined Local # 87.

Although Graham never became a member of Local # 22, he, as a "Traveler" working out of assignment from Local # 22 and as a dues paying member of the union, established, under the pension plan, ten years credited service between 1942 and 1958 and eight years between July 1, 1958 and April 1, 1969. "Travelers" were told where they could work by Local # 22 and were assigned work by the Local. The only time Graham did not work out of Local # 22 was when they refused him work. The pension plan began receiving funds in 1958 based on hours worked by employees from contributing employers. Graham retired April 1, 1969.

Brooks Baker, an official of Local # 22 who participated in its writing, testified the pension plan was written during the period 1958 and 1960 when it was put in final form and published. During that period most of the union members, if not all, who were not members of Local # 22 had to leave the Houston area for work because there was no work being assigned by Local # 22 to them.

Baker also testified:

Q You and those others drafting this pension plan, there in 1958 and '59, very well knew that you were writing out mostly nonlocal members, who would otherwise qualify, by simply saying if they didn't have a job on January 1, 1960, they wouldn't be an employee, if that is what you said; isn't that right?

A This is about right.

Q And you were fully aware of that when you were writing that—writing that out; right?

A Right.

. . . . .

Q But going back there to '58 and '59 and '60, when all these people who had worked between 1940 and 1960, who no longer had a job—who no longer had a job there, whether it was temporary or permanent, you were aware that they were being— they were members of the union, weren't they?

A Well, some may have been. Some may have not been.

Q Well, such as Mr. Graham—Ragan Graham; he was a member of that union, wasn't he?

A He wasn't a member of my union, no.

Q He wasn't a member of the local, but he was a member of the union?

A He was a member of the International.

Q Yes, sir.

A Right.

Q And you were aware that he was being deprived—people such as him were being deprived?

A We never know when these people are ever coming back our way. A lot of them, I haven't seen in twenty years. They may never come back.

Q But you were aware that they were being deprived of qualifying years; whereas, others—both members and

Q nonmembers—were being given those qualifying years by happenstance, weren't you?

A I agree.

. . . . .

Q —you had been in office for how many years?

A Seventeen.

Q For seventeen years. All right. In 1967, how many members, to your knowledge, were receiving—how many employees, to your knowledge, were receiving benefits under the pension trust, approximately?

A It would be purely a guess.

Q What is your best guess?

A My guess would probably be forty, or somewhere in that range.

Q About forty?

A Approximately.

Q Do you know how many of the forty, in '67, were travelers?

A None of them.

Q Do you know how many of those pension beneficiaries were travelers in '69—no, in '72, when you came into office?

A None of them.

Q Do you know how many were travelers, of the eighty, currently?

A Not a one.

Q So, in other words, there is not one member of the union who was a traveler, working through this local, that has received pension benefits as a consequence of the pension trust here in litigation?

A No, sir, there hasn't been one yet.

. . . . .

Q Do you know that he only got eighteen years' credit, if he got the ten years before January 1, 1960? Only eighteen years' credit between 1941 —I mean, only ten years' credit between 1941 and 1960, didn't he?

A This is right. But he got that because he wanted to work here rather than work in his home local.

Q Yes, sir. And you all were glad to have him?

A Sure.

Q And the employees he worked for from January—July 1, 1958 forward, paid money into the pension plan for the hours he worked, didn't they?

A This is right.

Q And in doing so, they enriched the pension plan, didn't they?

A This is correct.

Q And you knew that would happen on July 1, 1958 and January 1, 1960, didn't you?

A This is the way the business works.

Q Yes, sir. And you knew that if you wrote it when he wasn't here with jobs, that other members of the local would get the benefit of his pension payments by the employer, didn't you?

A You have to assume the turnovers that we have had over the years will, more or less, continue.

Q But you knew that those payments would not benefit Ragan Graham at that time and thereafter, and would benefit other members of your local union, didn't you?

A Only those people who did not stay long enough to qualify.

Q Yes, sir. But those people, such as Ragan E. Graham, who was then already fifty-seven or -eight years old—or fifty-five years old—and people older than fifty, would not get the benefit unless they could work far beyond age sixty-five; is that right?

A This is the end result. You are right."

Marvin Tripp was district manager for Pacific Mutual Life Insurance Company. He described the service provided the trustees of the pension plan by his company as follows:

"A We invest the funds. Pacific Mutual handles the investment of the funds, both in equities and the guaranteed account. And we also do the actuarial work on the plan, annual actuarial certification, to aid the

trustees in determining the benefits they wish to provide. And we also handle the drafting of the program, attend the trustees' meetings.

Q The drafting of the program?

A Yes. The drafting of amendments for it.

Q Of the amendments?

A Uh-huh.

.   .   .   .   .

Q And, of course, from time to time, you make funds available to retiring beneficiaries by paying them monthly sums?

A The trustees will send us a directive and tell us to pay John Jones, or whoever it might be, so much money per month. And with that, why, we start making payments from their funds directly to the man receiving benefits.

Q So, these funds are not your funds at all? They are their funds?

A That's correct.

Q And you are only servicing them, as an agent?

A As—that's correct."

This witness, appellants' expert as to the proper drafting and management of pension funds, during a regular meeting of the Trustees of the pension fund on November 4, 1969, offered an amendment to the Trust Agreement that provided past service credits to be given for employees who were employed at anytime during the period beginning July 1, 1958, and ending December 31, 1960.

■ The appropriate standard of review for this court so far as trustees' action in establishing terms of a trust for union pension plans is whether their action was unreasonable, arbitrary and capricious. *Roark v. Lewis*, 130 U.S.App.D.C. 360, 401 F.2d 425 (1968).

■ The economic conditions as of January 1, 1960, a matter well known to the Trustees, made the availability of work for Graham, a "Traveler", on that day practically non-existent. His willingness and readiness for work, his past work history and his past contribution to the pension fund were of no consequence. To exact a requirement, irrespective of all other matters that Graham must be employed by a contributing employer on January 1, 1960, when the evidence shows that the Trustees knew that no "Travelers" were so employed, is unreasonable, arbitrary and capricious. Appellants' own expert did not recommend such a limiting date. Since Graham meets all the other requirements, he is entitled to a pension.

■ We have considered only the evidence and inferences tending to support the findings of the court and disregarded all the evidence and inferences to the contrary in considering all the points of error presented by appellant. *Martinez v. Delta Brands, Inc.*, 515 S.W.2d 263 (Tex.1974). They are overruled.

The judgment is affirmed.